

Judith A.W. Studer, WY Bar No. 5-2174
Schwartz, Bon, Walker & Studer, LLC
141 S. Center Street, Suite 500
Casper, WY 82601
Phone: 307-235-6681
Fax: 307-234-5099
JStuder@schwartzbon.com

*Counsel for Unit-e Global, L.C.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **UNIT-E GLOBAL, L.C.** | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 24 CV 93 · KHR |
| | ) | |
| vs. | ) | |
| | ) | |
| **CHARLIE CHEDDAS', LLC** | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Unit-E Global, L.C. ("Unit-E Global") hereby brings this Complaint and Jury

Demand against Defendant Charlie Cheddas', LLC ("Cheddas'"), and states:

### NATURE OF THE CASE

1.      In late 2017 and early 2018, Unit-E Global and Cheddas' jointly created Gold Farm

LLLP ("Gold Farm"). Cheddas' was to provide the business and legal expertise, while Unit-E

Global was to provide the technological expertise.

2.      Cheddas' and its owners owed a duty to act in the best interest of Gold Farm.

Instead, Cheddas acted to enrich its own interests through destructive and self-interested actions.

3.  Cheddas further breached other clauses of Gold Farm's Operating Agreement.

4.  Cheddas caused damages in an amount more than $240,217.32.

## PARTIES

5.  Unit-E Global is a Maryland Company with its principal address at 1414 Shoemaker Road, Baltimore, Maryland 21209.

6.  Unit-E Global's members reside in Maryland.

7.  Cheddas' is a Colorado Company with a principal address of business at 1839 S. Academy Blvd, Colorado Springs, Colorado 80916.

8.  Upon information and belief, Cheddas' sole member is Trey Franzoy, who resides at 602 E 20th St, Cheyenne, Wyoming 82001.

9.  Gold Farm is a Wyoming Company with a principal address of business at 1603 Capitol Ave Suite 505 Cheyenne, WY 82001.

## JURISDICTION AND VENUE

10.  Diversity jurisdiction exists under 28 U.S.C. § 1332 since there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

11.  Per 28 U.S.C. § 1391(b)(2), the venue is proper in this judicial district because a significant portion of the events or omissions giving rise to the claim occurred within the U.S. District of Wyoming.

## FACTS

### A. General Background.

12.  Trey Franzoy held himself out to be a businessman able to navigate the regulations around gaming venues, especially cash-prize gaming venues.

13.  Cheddas' further wanted a custom payment website and technology to navigate Colorado's regulations.

2

14.     On this premise, in late 2017 and early 2018, Mr. Franzoy induced Unit-E Global to collaborate on a venture wherein Unit-E Global would provide the technological know-how, while Mr. Franzoy and Charlie Cheddas would provide the capital, business connections, and legal expertise.

15.     On or about June 18, 2018, Unit-E Global and Cheddas' entered into a Limited Liability Partnership Agreement (the "Operating Agreement"). This agreement laid out the terms by which their joint venture would be dictated. A copy of the signed Operating Agreement is attached as Ex. 1.

16.     The Operating Agreement lays out the obligations of Unit-E Global:

> Unit-e Global L.C. primary responsibilities will be to create, maintain, update, backup, and manage the entire e-commerce platform including all physical metals custodian and storage software, LLLP website, affiliate interface software, purchasing and selling merchant interface software. This includes the management of any hardware associated with the platform. Included in the platform will be a secure database to store all customer records verifying identity and addresses. It is understood by the controlling members that the e-commerce platform creation and maintenance is Unit-e Global L.C.'s contribution and stake of Member's LLLP share. Any initial costs and ongoing operating costs associated with the ecommerce platform will be paid by the LLLP.

Unit-E Global provided everything it needed under this agreement. *See* Ex. 1, "LLLP General Members Responsibilities and Limitations."

17.     Unit-E Global provided all necessary software. The only part of the software Cheddas' through Trey Franzoy provided was an interface with a specific payment gateway provider. Unit-E Global further maintained the codebase for security and other patches.

18.     Gold Farm's website at https://GoldFarm.net/ has been maintained and its server costs paid for by Unit-E Global.

**B. Lost profits.**

3

19.     Per the Operating Agreement, Unit-E Global was entitled to 50% of Gold Farm's profits. Ex. 1, Schedule 4.

20.     Upon information and belief, Cheddas' received profits from Gold Farm.

21.     In the same period, Unit-E Global did not receive any profits.

22.     It is estimated that from 2018 and 2019, Unit-E Global was denied $52,000.00 in lost profits.

23.     Despite Gold Farm turning a profit in 2020, Unit-E Global never received any disbursements, while Cheddas' did.

**C. Misappropriated Funds**

24.     Section 7 of the Operating Agreement dictates how the Banking of Gold Farm needs to be run. It specifically states that "any instructions for electronic transfer [must have] written confirmation … signed by the authorizing Members." Ex. 1 § 7.4

25.     Section 7 notes: "No member shall sign any cheque in favor of or give instructions for any transfer of money to himself or his spouse, child, parent, sibling, or other associate." Ex. 1 § 7.5.

26.     Section 16 of the Operating Agreement states: "No Member shall … knowingly cause or permit or suffer to be done anything whereby the property of the LLLP may be taken in execution or otherwise unreasonably endangered." Ex. 1 §§ 16, 16.2.3.[1]

27.     Upon information and belief, on or about February 9, 2022, Cheddas', through Trey Franzoy, withdrew $46,434.65 from Gold Farm's bank account.

28.     This sum was deposited into the COLTAF trust account of Mr. Franzoy's personal lawyer, who is not an agent of Gold Farm.

---

[1] The section heading is mislabeled as 13, but position as well as the headings of the subheadings demonstrates that this is section 16.

29.     At the same time, Unit-E Global received $0.00.

30.     This disbursement was despite the Operating Agreement mandating that any funds from Gold Farm be distributed 50/50 and even though the payment to Cheddas' was not approved by Unit-E Global.

31.     Shortly after February 9, 2022, Mr. Franzoy closed Gold Farm's bank account. This, again, was done without notice and the permission of Unit-E Global.

**D. Gold Farm's Stock.**

32.     Gold Farm holds bullion in its vaults at least equal to the sum of money in the various accounts. That is, since consumers buy precious metals in the vaults, there must be metal for the consumers to buy. *See* Ex. 1 ("Any transaction performed by the LLLP … will involve a physically verified and existing product consisting of only precious metals bullion").

33.     The Operating Agreement makes clear that "Cheddas' primary responsibilities [include] … ensure[ing] compliance with all State and Federal laws, regulations, and licensing requirements, cause[ing] the daily operating expenses, bills, and any other payments to be paid on time, [etc]." One such requirement was making sure that Gold Farm retained adequate bullion. Ex. 1 ("LLLP General Members Responsibilities and Limitations," "LLLP Operations and Limitations").

34.     As such, based on Gold Farm's figures, at the time of its winding down of consumer accounts it had at least $161,000 in bullion.

35.     Upon information and belief, Cheddas', through Trey Franzoy, misappropriated the bullion. This was in contravention of the Operating Agreement. Ex. 1, §§ 16.2, 16.2.3 ("No member shall … knowingly cause or permit or suffer to be done anything whereby the property of the LLLP may be taken in execution or otherwise unreasonably endangered.").

5

36.     As 50% owner, Unit-E Global is entitled to 50% of Gold Farm's assets. Its other owner, Cheddas', cannot wantonly misappropriate Gold Farm's assets.

37.     As a result, Unit-E Global suffered damages greater than $80,500.

### E. Breach of Good Faith and Fiduciary Duty.

38.     Section 6.2 and 6.2.2 of the Operating Agreement provides that the accounting records "shall be ... open to inspection by the Members." Ex. 1 § 6.2, 6.2.2

39.     Unit-E Global was denied the ability to inspect Gold Farm's records.

40.     Upon information and belief, despite the plain language of the Operating Agreement, Cheddas' failed to keep records.

41.     Per the Operating Agreement, Cheddas' was to "provide test locations for the ecommerce platform." The parties agreed this meant it was to find additional test locations and customers in addition to Cheddas' itself.

42.     Despite this, Cheddas' was the only venue to use Gold Farm, and did so briefly.

43.     In July 2019, Cheddas' stopped using Gold Farm's services.

44.     If Cheddas' had continued to use Gold Farm, then Gold Farm would have continued to turn a profit.  As such, over 2021, 2022, and 2023, Unit-E Global was denied $54,500 in lost profits due to Mr. Franzoy's mismanagement and disregard for the Operating Agreement.

### F.  Waiver of Arbitration Clause.

45.     Section 28 of the Operating Agreement states that "any dispute under or arising out of this Agreement shall be referred to single arbitrator (sic) to be appointed in default of agreement by this provision for the time being of the William McKellar Law firm located in Cheyene, WY, and the decision of the arbitrator shall be binding on all parties." Ex. 1 § 28.

46.     On March 28, 2024, Unit-E Global sent a demand for arbitration to Cheddas' per the Operating Agreement. *See* Ex. 2 (Email chain).

47.     On April 22, 2024, after hearing nothing from Cheddas' for almost a month about the pending demand, Unit-E Global followed up with Cheddas'. *Id.*

48.     On April 22, 2024, Unit-E Global learned that Cheddas' had retained Wyoming counsel. *Id.*

49.     Unit-E Global promptly reached out to Cheddas' Wyoming counsel on the same day and asked it to respond to its inquiry of which arbitrator to engage. *Id.*

50.     Cheddas' counsel did not respond to Unit-E Global's email. *Id.*

51.     A week later – and over a month since the original arbitration demand – on May 1, 2024, Unit-E Global again reached out to Cheddas' Wyoming counsel. In this email, Unit-E Global threatened to seek court intervention if Cheddas' did not respond. *Id.*

52.     On May 1, 2024, relying on inaccurate facts, Cheddas' Wyoming counsel rejected Unit-E's demand for arbitration. *Id.*  As such, Cheddas' has waived its right to arbitration.

### COUNT I
### (Unjust Enrichment)

53.     Unit-E Global adopts the preceding paragraphs as if fully set forth herein.

54.     Unit-E Global put work into Gold Farm.

55.     Unit-E Global put its own resources into Gold Farm.

56.     Cheddas' unfairly benefitted from Unit-E Global's time, work, and resources put into Gold Farm.

57.     Given Cheddas' behavior, it would be inequitable for it to continue to benefit from Gold Farm's work and resources with little or no compensation.

58.     Unit-E Global was damaged by its reliance in an amount more than $75,000.

7

WHEREFORE, Plaintiff Unit-E Global respectfully requests that this Court:

    (1)   Receive judgment against Defendant Cheddas' in an amount more than $210,217.32, plus interest, and the costs of this action.

    (2)   Grant such other further relief as this Court deems appropriate.

## COUNT II
### (Breach of Contract)

59.    Unit-E Global incorporates the preceding paragraphs as if fully set forth herein.

60.    The Operating Agreement constitutes a signed contract between Cheddas' and Unit-E.

61.    By its actions, Cheddas' has materially breached several terms of the Operating Agreement, including (but not limited to) sections 7, 10, 11 and 13 [16].

62.    These breaches materially damaged Unit-E Global.

    a.  $52,000 in net profits owed to Unit-E Global in 2018 and 2019 but not distributed;

    b.  $80,500 in the value of Unit-E Global's share of the physical silver bullion assets improperly removed from the company;

    c.  $23,217.32 as 50% of the unauthorized emptying and closure of Gold Farm's bank account; and

    d.  $54,500 in lost profits due to Cheddas' behavior stopping its use of Gold Farm in contravention of the Operating Agreement.

WHEREFORE, Plaintiff Unit-E Global respectfully requests that this Court:

    (1)   Receive judgment against Defendant Cheddas' in an amount more than $210,217.32, plus interest, and the costs of this action.

    (2)   Grant such other further relief as this Court deems appropriate.

## COUNT III
### (Breach of Fiduciary Duty and/or Breach of the Duty of Good Faith and Fair Dealing)

63.    Unit-E Global adopts the preceding paragraphs as if fully set forth herein.

64.     As Designated Members of the LLLP, Cheddas' owes a fiduciary duty to Unit-E Global with respect to the running of Gold Farm.

65.     Unit-E Global was justified in relying on the representations Cheddas' made and on relying on Cheddas' to manage Gold Farm for the good of them both. *See* Ex. 1 (The breakdown of Member Responsibilities is explicitly that Unit-E Global would provide the technical support while Cheddas' would handle the management).

66.     Unit-E Global's reliance was to its detriment. Cheddas' mismanaged the company and denied Unit-E Global disbursements. The decisions Cheddas' made for the company were frequently just for its own good, or for the good of its owner, Trey Franzoy.

67.     The Operating Agreement is a contract that requires the members to act in good faith and deal with one another fairly. The defendant breached the duty of good faith and fair dealing as outlined above.

68.     Unit-E Global was damaged in an amount to be determined, but more than $75,000.

WHEREFORE, Plaintiff Unit-E Global respectfully requests that this Court:

(1)   Receive judgment against Defendant Cheddas' in an amount more than $210,217.32, plus interest, and the costs of this action.

(2)    Grant such other further relief as this Court deems appropriate.

### COUNT IV
### (Conversion)

69.     Unit-E Global adopts the preceding paragraphs as if fully set forth herein.

70.     The bullion in Gold Farm's vaults belonged to Gold Farm, not Cheddas'.

71.     As a 50% owner, Unit-E was entitled to 50% of Gold Farm's assets, including the bullion Cheddas' wrongfully took from Gold Farm.

72.     Cheddas' took the bullion from the vaults without permission.

73.     This act was intentional, and in violation of the Operating Agreement.

74.     Cheddas' did not obtain permission from the other members of Gold Farm before wrongfully taking its assets.

75.     As a result, Unit-E Global suffered damages greater than $80,000.

WHEREFORE, Plaintiff Unit-E Global respectfully requests that this Court:

(1)   Receive judgment against Defendant Cheddas' in an amount more than $210,217.32, plus interest, and the costs of this action.

(2)    Grant such other further relief as this Court deems appropriate.

## COUNT V
### (Accounting)

76.     Unit-E Global adopts the preceding paragraphs as if fully set forth herein.

77.     Cheddas' held itself out to be the member of the relationship with business savvy, able to manage its affairs if Unit-E Global provided technical support.

78.     Per the Operating Agreement, Cheddas' was responsible for the day-to-day operations of paying bills and bookkeeping.

79.     Unit-E Global has been denied access to Gold Farm's business records.

80.     Cheddas' has failed to render an account of how much is owed to Unit-E Global.

81.     An accounting in equity is allowed "especially when "the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." *Davidson-Eaton v. Iversen*, 2022 WY 135, 519 P.3d 626 (Wyo. 2022). The Supreme Court of Wyoming has further held that the "equitable remedy of an accounting may apply under various circumstances" and this decision is within the trial court's discretion. *Y-O Invs., Inc. v. Emken*, 2006 WY 112, 142 P.3d 1127 (Wyo. 2006).

WHEREFORE, Plaintiff Unit-E Global respectfully requests that this Court:

10

(1)  Order Defendant Cheddas' to fully and completely account for all sums due to Unit-E Global;

(2)  Order Cheddas' pay Unit-E Global such sums; and

(3)  Grant such other further relief as this Court deems appropriate.


## JURY DEMAND

Per Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Unit-E Global respectfully demands a jury on all issued triable by one.

**DATED** this 7th day of May 2024.

Respectfully Submitted,

Judith A.W. Studer, WSB 5-2174
Schwartz, Bon, Walker & Studer, LLC
141 S. Center Street, Suite 500
Casper, WY 82601
307-235-6681
JStuder@schwartzbon.com

*Counsel for Unit-e Global, L.C.*


Of Counsel for Unit-e Global, L.C.:

Jan I. Berlage
GOHN HANKEY & BERLAGE LLP
201 N. Charles Street, Suite 2101
Baltimore, Maryland 21201
(410) 752-9300
(410) 752-2519 (fax)
JBerlage@ghsllp.com

*Counsel for Unit-e Global, L.C.*

**DATED 6/8/2018**

(1) Unit-e Global, L.C.

(2) Charlie Chedda's LLC

---

## LIMITED LIABILITY LIMITED PARTNERSHIP AGREEMENT

---

Gold Farm Limited Partnership LLLP

Doing Business As - Gold Farm

**EXPIRES: December 31st, 2030**
**Unless otherwise renewed or amended by Members in accordance with this agreement and the laws established by the State of Wyoming**



EXHIBIT


TMF


EY

**This LIMITED LIABILITY LIMITED PARTNERSHIP is dated** 6/1/2018 and made

**BETWEEN:**

(1)     Unit-e Global, L.C. of 3737 Old Georgetown Road, Arbutus, MD 21227

(2)     Charlie Chedda's, LLC of 613 S. Inca Dr., Pueblo West, CO 81007

**WHEREAS:**

The parties (hereinafter referred to as the "Members") named above wish to enter into a new partnership subject to the terms and conditions of the Limited Liability Company Act;

**IT IS HEREBY AGREED** as follows:

1.     **Definitions and interpretation**

    1.1     For the purposes of this Agreement the following expressions have the following meanings:

| | |
|---|---|
| "Accounting Year" each year; | means a calendar year ending on December 31st in |
| "the Act" | means the Wyoming Limited Liability Company Act; |
| "the Auditors" | means auditors or such other auditors as may from time to time be appointed in accordance with the provisions of this Agreement; |
| "the Business" | means the profession trade or business of Wholesale Precious Metals storage, purchase, and sells to be carried on by the LLLP; |
| "the Capital" | means the net capital of the LLLP as shown in any balance sheet prepared in accordance with the provisions of this Agreement as belonging to the Members and being the excess of the assets of the LLP over its liabilities; |
| "the Commencement Date" | means June 8th, 2018; |
| "Cessation Date" | the date upon which a Member retires, is deemed to retire or is expelled from the LLLP; |
| "Contribution" | means any money or assets paid into the accounts of or transferred into the ownership of the LLLP by a Member less any liabilities attaching to such money or assets which shall be assumed by the LLLP in substitution for members; |
| "Current Account" | means the account of a Member with the LLLP to which there shall be credited all amounts of profit payable to that Member or against which there shall be debited any loss in respect of that Member in accordance with clause 9 so that any credit balance from time to time in respect |



TMF          EY

of any Current Account shall be a debt due from the LLLP to the relevant Member;

"the Designated Members"   means all the Members **OR** those Members whose names and addresses appear in Schedule 1, Part 1 or such of the Members for the time being of the LLLP as shall be designated in accordance with the provisions of this Agreement;

"Drawings"   means sums drawn by any Member on account of any anticipated profits of the LLLP and any other sums paid, or assets applied for his personal benefit by the LLLP (other than for any such expenses as shall be provided for in this Agreement) including in particular but without limitation any Tax paid on his behalf by the LLLP;

"the Initial Members"   Means the persons (whether individuals in limited liability partnerships or limited companies) whose names and addresses appear in Schedule 1;

"Intellectual Property"   means all industrial and intellectual property rights including without limitation, domain names, patents, trade marks and/or service marks (whether registered or unregistered), registered designs, unregistered designs and copyrights and any applications for any of the same owned by the LLLP and used in connection with the Business and all Know-how and confidential information so owned and used;

"Know-how"   means all information (including that comprised in or derived from data, disks, tapes, manuals, source codes, flow-charts, manuals and instructions) relating to the Business and the services provided by it;

"the LLLP"   means the limited liability limited partnership to be incorporated under the name Gold Farm Limited Partnership, LLLP which the Members shall seek to register at the Wyoming Secretary of State office;

"the Members"   means those of the Initial Members and/or such other or additional persons as may from time to time be appointed in accordance with the provisions of this Agreement whose membership of the LLLP has not been determined in accordance with those provisions;

"Member's Share"   means a Member's share and interest of and in the Capital;

"the Name"   means Gold Farm Limited Partnership, LLLP **OR** limited liability partnership, **OR** LLLP **OR** limited liability limited partnership or such other name as shall from time to time be registered by the LLLP at the Wyoming Secretary of State office as its name;



| | |
|---|---|
| "Payment Date" | shall mean last day in each calendar month or, if the same shall not be a Working Day, then the Working Day immediately following the same; |
| "Property" | means property from which the Business currently operates; |
| "Tax" | means any Income Tax, Capital Gains Tax or National Insurance Contribution payable by any Member in respect of his status as a member of the LLLP or his share of the profits of the LLLP or the proceeds from the disposal of any of the assets of the LLLP; |
| "Working Day" | means any day from Monday to Friday inclusive save for any such day which is a bank or statutory holiday; and |
| "Year End Date" | means December 31st. |

1.2 Reference to any profits or losses of the LLLP includes a reference to profits and losses of a capital nature.

1.3 Reference to any statute or statutory provision includes a reference to that statute or provision as from time to time amended extended re-enacted or consolidated and to all statutory instruments or orders made under it.

1.4 Words denoting the singular number include the plural and vice versa.

1.5 Words denoting any gender include all genders and words denoting persons include firms and corporations and vice versa.

1.6 Unless the context otherwise requires reference to any clause, paragraph or Schedule is to a clause, paragraph or Schedule (as the case may be) of or to this Agreement.

1.7 The headings in this document are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

2. **Incorporation**

2.1 The Members shall complete and deliver to the Wyoming Secretary of State Office all such documents and pay all such fees as shall be necessary to lead to the incorporation of the LLLP in accordance with the Act.

2.2 The certificate of registration of the LLLP to be issued under the Act shall be kept at the Registered Office.

3. **Commencement and duration**

3.1 The provisions of this Agreement shall take effect on the Commencement Date.

3.2 The LLLP shall carry on the Business and/or carry on such other or additional trade profession or business as the Members shall from time to time determine.

3.3 The LLLP shall subsist until wound up in accordance with the provisions of the Act.


TMF        EY

3.4   In the event that any Member may be personally liable under any contract entered into by him prior to the incorporation of the LLLP which was for the benefit of the LLLP and with the express or implied consent of the other Members then the LLLP shall on incorporation be deemed to ratify that contract and shall indemnify that Member from and against all claims, liabilities and costs in connection with it.

4.   **Name and registered office**

4.1   The Designated Members may from time to time determine upon a change in the Name and/or the registered office of the LLLP.

4.2   Upon any change in the Name and/or the registered office of the LLLP it shall be the responsibility of the Designated Members to the Wyoming Secretary of State office of any such change in accordance with the Act.

5.   **Property and place of business**

5.1   The Business shall be carried on by the LLLP from the property and remotely.

5.2   In the event that any property from time to time comprised within the Property shall be vested in any one or more of the Members (or any nominees for them) those Members (or nominees):

5.2.1 shall as from the Commencement Date be deemed to have held it in trust for the LLLP and the LLLP shall indemnify them and their respective estates and effects against all liability in respect of that Property after the Commencement Date;

5.2.2 shall upon service upon them of any notice requesting them so to do and on receipt of any necessary mortgagee's and/or landlord's consents permitting them so to do convey, transfer or assign the same to the LLLP at the cost of the LLLP and upon the LLLP indemnifying them and their respective estates and effects against all future liability in respect of that Property after the date of conveyance transfer or assignment;

5.2.3 Provided that for the purposes of this clause liability shall include in particular, but without limitation, all liability in respect of any outgoings payable in respect of the relevant Property, any restrictive covenants relating to it, any rent falling due in respect of it and the performance and observance of any lessees' covenants relating to it.

5.3   The Property, the Intellectual Property and all computers and ancillary equipment, office equipment, furniture, books, stationery and other property and equipment in or about the Property and used for the purposes of the Business shall be the property of the LLLP.

6.   **Accounts**

6.1   It shall be the responsibility of the Members to ensure that accounting records giving a true and fair view of the Business and the affairs of the LLLP shall be properly maintained. Such accounting records must, in particular contain, entries showing all money received and expended by the LLLP and a record of the LLLP's assets and liabilities.

6.2   Such accounting records shall be:

$\frac{7\sim 3}{\text{TMF}}$    $\frac{}{\text{EY}}$

6.2.1 kept at the LLLP's registered office or at such other place as the Members may from time to time determine by a supermajority vote;

6.2.2 open to inspection by the Members; and

6.2.3 kept for a period of three years from the date they were made.

6.3 The Designated Members shall (acting where appropriate in accordance with the requirements of The Limited Liability Limited Partnerships (Accounts and Audit) (Application of Companies Act) anti money laundering regulations) by a majority vote:

6.3.1 appoint Auditors during or before the LLLP's first period for appointing auditors;

6.3.2 be deemed to appoint the Auditors as auditors of the LLLP for each subsequent Accounting Year;

6.3.3 have power to remove the Auditors from office;

6.3.4 have power to fix the remuneration of the Auditors.

6.4 The Members may from time to time determine to amend the LLLP's accounting reference date by a supermajority vote.

6.5 A profit and loss account as at the Year End Date shall be prepared for each Accounting Year together with a balance sheet and the same shall be audited in accordance with all relevant Financial Reporting Standards and in such format and giving such information notes and disclosure of the interests of the Members in the LLLP as may be required by The Limited Liability Limited Partnerships (Accounts and Audit) (Application of Companies Act) anti money laundering regulations.

6.6 The accounts to be prepared in accordance with clause 6.5 shall be:

6.6.1 accompanied by the Auditor's report;

6.6.2 approved by the Members and signed on behalf of all the General Members by a Designated Member in accordance with The Limited Liability Limited Partnerships (Accounts and Audit) (Application of Companies Act) anti money laundering regulations which approval shall be given at a meeting and shall thereafter become binding on all Members save that any Member may request the rectification of any manifest error discovered in any such accounts within three Months of receipt of the same;

6.6.3 distributed to all Members as required by The Limited Liability Limited Partnerships (Accounts and Audit) (Application of Companies Act) anti money laundering regulations; and

6.6.4 filed at registered office in accordance with The Limited Liability Limited Partnerships (Accounts and Audit) (Application of Companies Act) anti money laundering regulations.



7. **Banking arrangements**

7.1 The bankers shall be determined by the members and/or such other bank as the Designated Members may from time to time determine by supermajority vote and notify to all Members as being the lead bank or a subsidiary bank of the LLLP ("the Bank").

7.2 All money, cheques and drafts received by or on behalf of the LLLP solely shall be paid promptly into the bank account of the LLLP and all securities for money shall be promptly deposited in the Name of the LLLP with the Bank.

7.3 In the event that it shall be a normal part of the Business to receive money on behalf of any client or third party the LLLP shall open a separate client account or accounts with the Bank and:

7.3.1 all money, cheques and drafts received by or on behalf of such clients or third parties shall be paid promptly into such client account(s) and all securities for money shall be promptly deposited in the name of the clients or third parties with the Bank;

7.3.2 any such account or accounts shall at all times be operated by the LLLP strictly in accordance with any rules or regulations of any professional or regulatory body which may exercise relevant jurisdiction over the LLLP.

7.4 All checks drawn on or instructions for the electronic transfer of money from any such account as is mentioned in this clause 7 shall be in the Name of the LLLP and may be drawn or given by any Designated Member **OR** two Designated Members and in the case of any instructions for electronic transfer written confirmation of those instructions shall be signed by the authorizing Members.

7.5 No Member shall sign any cheque in favor of or give instructions for any transfer of money to himself or his spouse, child, parent, sibling, or other associate.

8. **Members' shares and contributions**

8.1 General Members acquire their Member's Share of LLLP ownership as per Schedule 3.

8.2 No Member shall be entitled to any interest on the amount for the time being of his Member's Share.

9. **Profits and losses**

9.1 References to sums being credited or debited to Members in this clause shall be construed in accordance with the following provisions:

9.1.1 all sums to be credited to a Member shall be credited to his Current Account;

9.1.2 all sums to be debited against a Member shall be debited against his Current Account.;

9.1.3 if any sums shall fall to be debited against a Member at any time when his Current Account has been exhausted then the same shall be set-off against any other monies owed to him by the LLLP but if there shall be no such monies or if they shall be insufficient for the purposes of that set-off then they may be set-off against any future credits due from the LLLP to the



Member but for the avoidance of doubt the Member shall not be required to pay any sums to the LLLP in respect of any unsatisfied element of such debits;

9.1.4 the Designated Members may at any time by unanimous vote determine to credit or debit at such time as they may specify all or any part of any profits earned by or losses incurred by the LLLP in respect of any Accounting Year;

9.1.5 all sums shown in the accounts of the LLLP as profits or losses in respect of any Accounting Year shall (save insofar as they may already have been credited or debited in accordance with clause 9.1.4) be deemed to be credited or debited automatically and immediately upon the approval of the accounts for any Accounting Year in accordance with clause 6.6 (unless the Designated Members shall at the time of or prior to that approval by unanimous vote determine to postpone the operative time of such crediting or debiting either generally or until such time as they may specify).

9.3 Before the division of any profits of the LLLP there shall be credited to each of the Members named in Schedule 3 out of such profits the prior share of profit specified in that Schedule for him provided that:

9.3.1 in the event that the aggregate of such prior shares of profit to be so credited to Members shall exceed the available profits of the LLLP for the Accounting Year in question then such prior shares shall abate rateably;

9.3.2 in the event that there shall be no profits so available no such prior shares of profit shall credited to any Member.

9.4 The profits and losses of the LLLP after allowing for any amounts payable in accordance with clause 9.3 shall (as the case may be) be credited to or debited against the Members' Current Accounts as follows:

9.4.1 as to the Primary Percentage of any profits or as to the total of any losses in the proportions set out in Schedule 4;

9.5 Notwithstanding the provisions of clauses 9.3 and 9.4, where during any Accounting Year any Member was prevented by reason of ill-health or accident from devoting his full time and attention to the Business (except during holiday leave, maternity leave or parental leave) for a period of more than 13 successive weeks or for any lesser period commencing within 26 weeks after the Member in question shall have resumed normal duties following a period of such absence exceeding 13 weeks then the share of profits to which such Member is entitled shall after that period be reduced by the Weekly Sum for every complete week of incapacity until he shall resume normal duties and the share of the profits of the other Members shall be increased by a like sum and be divided between them equally.

10. **Drawings**

10.1 There shall be paid to each Member the Drawings amount specified in Schedule 5, which may be altered by unanimous vote of the General Members, and notification of any such change shall be given by the Designated Members to all Members.



10.2 Any further payments to be made to or on behalf of any Member and any assets to be transferred to or for the benefit of any Member shall only be made, transferred or applied with the consent of the Designated Members and notification of any such payment transfer or application shall be given by the Designated Members to all Members.

10.3 The LLLP shall on the taking of the annual accounts provided for in clause 6 reserve out of profits before distribution:

10.3.1 any amounts of Tax estimated by the Auditors to be payable by Members during the next following Accounting Year and each Member shall be charged with his due proportion of such Tax; and

10.3.2 such amount as the Designated Members shall determine in order to provide further working capital for the Business.

10.4 The LLLP shall pay for the benefit of each Member such amounts of Tax as shall be payable by him.

10.5 If on the taking of any such annual accounts they shall show that in the relevant Accounting Year any Member drew pursuant to the provisions of this clause 10 in excess of his share of the profits for that Accounting Year then such Member shall repay the excess forthwith together with interest on the excess or such part of the excess as shall from time to time be outstanding at the Interest Rate from a date being one Month after the receipt by him of such accounts to the date of repayment.

10.6 Subject to clause 10.3 each Member shall be entitled to be paid by the LLLP the balance (if any) of his actual share of any profits shown in the accounts for any Accounting Year at any time after the same has been approved in accordance with clause 6.6.

## 11. Members' obligations and duties

11.1 Each Member shall at all times:

11.1.1 devote his agreed to time and attention to the Business except during, Family Leave or incapacity due to illness injury or other substantial cause;

11.1.2 not without the consent of the Designated Members by supermajority vote engage in any business other than the Business or accept (otherwise than in a voluntary or honorary capacity) any office or appointment unless that other Business or the office or appointment is not in competition with the Business (and in the event of any breach of this clause the Member shall account to the LLLP for any profit derived by him from the business office or appointment in question);

11.1.3 not without the consent of the Designated Members by supermajority vote derive any benefit from the use of the Name or the Property or the business connection of the LLLP (and in the event of any breach of this clause the Member shall account to the LLLP for any profit derived by him from the use in question);

11.1.4 conduct himself in a proper and responsible manner and use his best skill and endeavor to promote the Business; and




    11.1.5 comply with all statutes, regulations, professional standards and other provisions as may from time to time govern the conduct of the Business or be determined by the Designated Members as standards to be voluntarily applied by the LLLP to the Business.

11.2 Each Member shall at all times show the utmost good faith to the LLLP **OR** For the avoidance of doubt the Members shall not owe fiduciary duties to each other or to the LLLP (save for such fiduciary duties to the LLLP as are implied by their status as agents of the LLLP).

12.    **Management**

15.1 Meetings of each of the Designated Members and the Members shall be held at least once a year and shall normally be convened by either member or not less than 2 Designated Members or Members as the case may be (or by any liquidator of the LLLP appointed under the Insolvency Act 1986).

15.2 Not less than one month's notice of any such meeting shall be given to all those entitled to attend the same provided that any resolution passed at a meeting of which shorter notice or no notice has been given shall be deemed to have been duly passed if it is afterwards or concurrently ratified by the required majority of the Designated Members or the Members as the case may be at a duly convened meeting.

15.3 All issues that will be put to a vote must be on a written on the agenda supplied with the notice of the meeting's place, time, and date.

15.4 Meetings of either the Designated Members or the Members shall be chaired by any member, by such Designated Member or Member as shall be appointed for the purpose by those present at the meeting.

15.5 Meetings may be attended remotely by audio (video optional). Remote voting shall be permitted.

15.6 No business shall be conducted at a meeting of the Designated Members or the Members as the case may be unless the Designated Members' Quorum or the Members' Quorum shall respectively be present in person (or have been present earlier in the meeting) provided that any resolution passed at an inquorate meeting shall be deemed to have been duly passed if it is afterwards ratified by the required majority of the Designated Members or the Members as the case may be at a duly convened and quorate meeting.

15.7 Proxy voting shall be permitted.

15.8 Any matters which are by reason of the Act or by this Agreement reserved for the decision of the Designated Members shall be determined by them by a simple majority if a supermajority (>66.67%) or unanimous vote is not required **OR** by unanimous vote if only two members are voting at a duly convened meeting provided that a resolution in writing signed as approved by a majority **OR** all if required by the members or of the Designated Members shall be as valid as a resolution passed at such a meeting.

15.9 Any matters not either:

    15.7.1 reserved as above for the decision of the Designated Members (or which have been thus reserved but in respect of which the Designated Members



shall have defaulted in exercising their powers or taking any decision or other step required of them by the Act or any other statute within any time limit prescribed); or

15.7.2 delegated as below for the decision of a committee

shall be determined by the Members by their votes at a duly convened meeting (save that any such decision taken in anticipation of any default by the Designated Members in acting as above shall only take effect upon the expiry of the time prescribed by law for that action if the Designated Members shall not in fact have acted appropriately by that time).

15.8 At any meeting of the Members a decision may be taken by a simple majority if a supermajority (>66.67%) or unanimous vote is not required save that:

15.8.1 a majority of not less than seventy five per cent of the Members present and voting shall be required for any of the following purposes:

15.8.1.1 any determination to be made under the Insolvency Act 1986 including in particular but without limitation any determination to propose for a Voluntary Arrangement in respect of or a voluntary winding-up of the LLLP;

15.8.1.2 any resolution to appoint any Member(s) as delegates empowered on behalf of the LLLP to approve or reject under the Insolvency Act 1986 Section 4(5A) any modifications to any proposed Voluntary Arrangement in respect of the LLLP;

15.8.1.3 any resolution to give or withhold any sanction required under the Insolvency Act 1986 including in particular but without limitation any sanction under the Insolvency Act 1986 Sections 110(3), 165(2).

15.8.2 a unanimous vote of the Members present and voting shall be required for any of the following purposes:

15.8.2.1 the opening or closing of any place of business of the LLLP;

15.8.2.2 the admission of any Member or the passing of a resolution authorizing the service of Member in accordance with clause 20.3;

15.8.2.3 the appointment of any Member as a Designated Member;

15.8.2.4 the appointment of all Members for the time being as Designated Members;

15.8.2.5 the purchase of any capital item or connected items of equipment with a cost greater than $1,000 AND having (in the aggregate where appropriate) a cumulative cost in excess of $ 25% of LLLP's retained earnings (among all like purchases in a fiscal year) or 5% of LLLP's retained earnings (among all like purchases in a 30-day period);

15.8.2.6 the borrowing or lending by the LLLP or the giving of any guarantee or undertaking by the LLLP or of or in respect of any sum or connected sums being (in the aggregate where appropriate) in excess of $50,000.00 or 10% of LLLP's retained earnings, whichever is lesser;



15.8.2.7 the delegation (or revocation of such delegation) of powers to a committee in accordance with clause 15.9;

15.8.2.8 a change in the nature of the Business; and

15.8.2.9 any amendment to this Agreement.

15.9 The Members may from time to time delegate (or revoke the delegation of) any of their powers of managing or conducting the affairs of the LLLP to a committee or committees consisting of such Members and any employees of the LLLP as are appointed in the appropriate resolution provided that such delegation may be made subject to such conditions as the resolution may prescribe.

15.10 The procedure for the conduct of any such committee as is formed in accordance with clause 15.9 shall be as prescribed by the resolution establishing it or if the resolution does not do provide shall be as determined by a majority of that committee.

13.    **Limitations on members' powers as agents**

The following limitations on the powers of any individual Member to act as an agent of the LLLP shall apply:

16.1 No Member shall without the consent of at least all of Members:

16.1.1 engage or dismiss any employee of the LLLP;

16.1.2 pledge the credit of the LLLP or incur any liability or lend any money on behalf of the LLLP as per 15.8.2.6;

16.1.3 give any guarantee or undertaking on behalf of the LLLP in respect of any sum or connected sums as per 15.8.2.6;

16.1.4 compromise or compound or (except on payment in full) release or discharge any debt or connected debts due to the LLLP where the same exceed (in the aggregate where appropriate) $5,000.00 or 1% of LLLP's retained earnings, whichever is lesser.

16.2 No Member shall:

16.2.1 have any dealings with any person, partnership, limited liability partnership or limited company with whom or which the Members have previously resolved by supermajority vote not to deal;

16.2.2 procure that the LLLP shall enter into any bond or become bail or surety for any person;

16.2.3 knowingly cause or permit or suffer to be done anything whereby the property of the LLLP may be taken in execution or otherwise unreasonably endangered;

16.2.4 assign, mortgage or charge his interest in the Capital; or

16.2.5 be entitled to make any application to the Court under the Companies Act 2006 Section 994.



17. **Indemnity and expenses**

17.1 The LLLP shall indemnify each Member from and against any claims, costs and demands arising out of payments made by him or liabilities incurred by him in the performance by him of his duties as a Member in the normal course of the operation of the Business or in respect of anything necessarily done by him for the preservation of the Business or the property of the LLLP.

17.2 Each Member shall be entitled to charge and be refunded all out-of-pocket expenses properly incurred by him in connection with the Business provided that:

17.2.1 All expenses shall be vouched by an appropriate receipt

17.2.2 If the LLLP shall provide a credit card for the use of a Member for such expenses he shall provide to the LLLP the original vouchers for all expenditure charged to such card;

17.2.3 The Members may from time to time resolve by vote to place upper limits on any category or categories of expenses of which reimbursement may be claimed by Members.

18.3 .

19. **Insurance**

19.1 The LLLP shall maintain policies of insurance for such respective amounts as the Designated Members may from time to time determine in respect of:

19.1.1 the Property;

19.1.2 all equipment and other property belonging to or used by the LLLP;

19.1.3 all cars and other vehicles belonging to or used by the LLLP;

19.1.4 employers' liability;

19.1.5 public liability;

19.1.6 professional negligence;

19.1.7 loss of profits consequent upon destruction of or damage to the Property;

19.1.8 loss of profits consequent upon destruction of or damage to or theft of any equipment, property, cars and other vehicles including in the case of any computers or ancillary equipment any virus or corruption or loss of any software or data; and

20. **Retirement**

20.1 A Designated Member may resign his designation upon giving notice to the LLLP and to the other Members such notice to take effect upon the expiry of the notice period from the date of the said notice save that in the event that such resignation would reduce the number of Designated Members of the LLLP to one then the notice shall not take effect until the Members shall have appointed a new Designated Member to fill the vacancy to be created by the said notice.




20.2 If any Member shall give to the LLLP and to the other Members notice of his intention to retire from the LLLP then on the expiry of the notice he shall retire from the LLLP provided that such notice period shall not be less than 90 days.

20.3 A Member shall be deemed to retire from the LLLP:

20.3.1 on the expiry of not less than three Months' notice requiring him to retire given to him by the LLLP at a time when by reason of illness, injury or other cause he has been unable to perform his duties as a Member and has been so unable throughout the period of at least twelve Months immediately preceding the service of the notice or for an aggregate period of at least twelve Months during the period of twenty-four Months immediately preceding such service provided that:

20.3.2.1 there shall be excepted from the calculation of any such period any period(s) of Maternity Leave, Parental Leave or Family Leave; and

20.3.2.2 a notice under this clause shall be of no effect if before it expires the Member upon whom it has been served satisfactorily resumes his duties as a Member and the LLLP accordingly resolves to withdraw the notice;

20.3.2 forthwith on the service upon him of notice in writing requiring him to retire given by the LLLP at any time after he has become a patient within the meaning of the Mental Health Act 1983 Section 94(2) or Section 145(1).

21. **Expulsion**

If any Member shall:

21.1 commit any grave breach or persistent breaches of this Agreement; or

21.2 be guilty of any conduct likely to have a serious adverse effect upon the Business; or

21.3 cease to hold any professional qualification or certification required for the normal performance of his duties as a member of the LLLP;

then the LLLP may by notice in writing given to him be entitled forthwith to expel him from membership of the LLLP provided that any such notice shall give sufficient details of the alleged breach or breaches to enable the same to be properly identified and provided further that if the Member on whom such notice is served shall within fourteen days of the date of service of that notice serve on the LLLP a counter-notice denying the allegations and shall within that period of fourteen days refer the dispute to Arbitration the operation of the said notice shall be suspended until written notice of acceptance by the Member on whom it has been served is served on the LLLP or the decision of the appropriate arbitrator and any reference in this Agreement to a date of cessation of membership consequent upon such a notice of dissolution shall be deemed to be a reference to the date of the notice of acceptance or the decision of the arbitrator as the case may be.

22. **Provisions relating to retirement or expulsion**

22.1 In the event that any Member shall on a date other than a Year End Date retire or be deemed to retire or be expelled then:




22.1.1 he shall not be entitled to receive any share of the profit of the LLLP from the date of his ceasing to be a Member;

22.1.2 the LLLP shall not be obliged to prepare any accounts other than the accounts which would normally prepared as at the next Year End Date;

22.1.3 for the purpose of ascertaining the amount of the Member's Share of the Member in question the profits of the LLLP in such accounts shall be apportioned on a time basis in respect of the periods before and after his death retirement or expulsion.

22.2 In the event of retirement or expulsion of any Member there shall be due to him from the LLLP the amount of his capital account(s) and Member's Share as shown in the accounts of the LLLP for the Year End Date next following such retirement or expulsion or upon which the same shall take effect.

23. **Payments following death, retirement or expulsion**

23.1 In the event of the death of any Member being an individual the LLLP shall:

23.1.1 pay on the first day of each of the three Months next following that Member's death an amount equal to the normal monthly Drawings then applicable in accordance with Clause 10.1 such payments to be made to the deceased Member's personal representatives or widow or to such other person as the LLLP shall at its absolute discretion determine (provided that the LLLP shall not be concerned as to whether the recipient(s) of such payments shall in due course prove to be the person(s) entitled at law to the deceased Member's estate);

23.1.2 pay the appropriate Member's Share (after allowing for any such payments as are referred to in clause 23.1.1) to the deceased Member's personal representatives as soon as may be reasonably practical but in any event within one year of his death.

23.2 In the event of any retirement deemed retirement or expulsion of any Member or in the event of the dissolution winding up or striking off of any Member being a body corporate then that Member's Share together with interest at the Interest Rate upon the balance of that Member's Share for the time being outstanding shall be paid by the LLLP to the retiring or expelled Member or to any liquidator appointed in respect of the Member or to the Secretary of State (as the case may be) by equal half yearly instalments over the Payment Period (the first such payment being due on the Year End Date occurring next after the retirement expulsion dissolution winding up or striking off takes effect) provided that the LLLP shall be entitled at any time to make such payments earlier than so required at its absolute discretion.

24. **Other provisions following death retirement or expulsion**

24.1 Any Member who shall have retired or been deemed to retire or been expelled shall (unless superseded by majority vote):

24.1.1 Not before the 2nd Year End Date following the relevant Cessation Date:

24.1.1.1 solicit business from canvass or accept instructions to supply goods or services to or for any person, firm, limited liability partnership or limited company which has habitually introduced




clients or customers to the LLLP or was a client or customer of the LLLP during the period of one year preceding the relevant Cessation Date;

24.1.1.2 solicit or induce or endeavor to solicit or induce any person who is at the relevant Cessation Date a Member or an employee in any capacity whatever of the LLLP to cease to be a member of, or to work for, or provide services to the LLLP whether or not any such person would by such cessation commit a breach of contract;

24.1.1.3 employ or otherwise engage anyone who is at the relevant Cessation Date a Member or an employee in any capacity whatever of the LLLP;

24.1.1.4 engage in any business of a nature similar to that of the Business (whether on his own account or as a partner, or member in, or an employee of, or consultant to any other person, partnership, limited liability partnership or limited company) within a 100 mile radius of any place of business of the LLLP at the relevant Cessation Date;

Provided that each of the separate paragraphs of this clause shall constitute an entirely separate and independent restriction so that if one or more of them are held to be invalid for any reason whatever then the remaining paragraphs shall nonetheless be valid.

24.2 Pay into the LLLP's bank account all sums due from him to the LLLP and any sums not so paid shall be recoverable by the LLLP from him as a debt.

24.3 Deliver to the LLLP all such books of account, records, letters and other documents in his possession relating to the LLLP as may be required for the continuing conduct of the Business but during any subsequent period in which there shall still be money owed to him by the LLLP the retired or expelled Member or his duly authorized agents shall be permitted to inspect by appointment the books of account, records, letters and other documents of the LLLP insofar as they relate to any period preceding the Cessation Date.

24.4 Sign, execute and do all such documents, deeds, acts and things as the LLLP may reasonably request for the purpose of conveying, assigning or transferring to it any Property or assets which immediately prior to the Cessation Date were vested in the retired or expelled Member as nominee for or in trust for the LLP.

## 25. Winding up

25.1 For the avoidance of doubt no Member has agreed with the other Members or with the LLLP that he shall in the event of the winding up of the LLLP contribute in any way to the assets of the LLLP in accordance with the Insolvency Act 1986 Section 74.

25.2 In the event of the winding up of the LLLP then any surplus of assets of the LLLP over its liabilities remaining at the conclusion of the winding up after payment of all money due to the creditors of the LLLP and all expenses of the winding up shall be payable by the liquidator to the Members in such proportions as their respective Members' Shares shall have borne to each other on the day before the commencement of the winding up.



25.3 In the event that any Court makes a declaration or declarations under the Insolvency Act 1986 Section 214A requiring any Member or Members to make any Contribution to the assets of the LLLP then the other Member(s) shall indemnify the Member(s) in respect of whom the said declaration(s) shall have been made in such manner that the amount or aggregate amounts payable in accordance with the said declaration(s) shall be borne by the Members in the proportions set out in Schedule 4.

26.    **Guarantees and Indemnities**

26.1 In the event that any Member shall have given any guarantee on behalf of the LLLP and (if so required by clause 16.1.3) have obtained the necessary consent for that then:

26.1.1 If any guarantee so given shall be called upon by the person to whom it has been given then upon making any payment properly due under that guarantee the Member in question shall be entitled to be indemnified forthwith by the other Members in such manner that the amount or aggregate amounts payable in accordance with the said guarantee shall be borne by the Members in the proportions set out in Schedule 4;

26.1.2 Upon the death, dissolution, retirement, deemed retirement or expulsion of that Member the other Members shall:

26.1.2.1 use their best endeavors to procure that the person having the benefit of the guarantee shall release that Member (or his estate) from the guarantee;

26.1.2.2 provide a substitute guarantor if required by that person as a condition of release;

26.1.2.3 jointly and severally indemnify the Member in question or his estate from and against any liability under the guarantee arising after the date of the death or dissolution of or the Cessation Date relating to that Member

26.2 For the avoidance of doubt nothing in this clause 26 shall require any Member to indemnify any other Member against any claim or liability resulting from the negligent act or omission of that other whether such claim is brought by the LLLP itself or by any third party and whether the other Member is solely liable or is co-extensively liable with the LLLP.

27.    **Notices**

27.1 Any notice herein referred to shall be in writing and shall be sufficiently given to or served on the person to whom it is addressed if it is delivered to or sent in a prepaid first class letter by the Recorded Delivery Service addressed (in the case of notice to the LLLP) to its Registered Office or (in the case of notice to any Member) to him at his residential address as registered for the time being with Companies House and shall be deemed to have been delivered in the ordinary course of post.

27.2 For the purposes of this Agreement any notice shall be deemed to have been given to the personal representatives of a deceased Member notwithstanding that no grant of representation has been made in respect of his estate in England if the notice is addressed to the deceased Member by name or to his personal



representatives by title and is sent by prepaid letter by the Recorded Delivery Service to the residential address as registered for the time being with Companies House of the deceased at his death.

28.    **Arbitration**

28.1  Any dispute under or arising out of this Agreement shall be referred in to a single arbitrator to be appointed in default of agreement by this provision for the time being of the William McKellar Law firm located in Cheyenne, WY, and the decision of the arbitrator shall be final and binding on all parties

.

<span>TMF</span>    <span>EY</span>

## SCHEDULE 1
Members' names and addresses

General & Designated Members

1.  Unit-e Global, L.C.
    3737 Old Georgetown Rd., Halethorpe, MD 21227
    by Eric Yockey (CEO, Unit-e Global, L.C.)
    1408 Gardman Ave, Baltimore, MD 21209
    unitetechno@gmail.com

2.  Charlie Chedda's LLC
    1839 S. Academy Blvd., Colorado Springs, CO 80916
    by Trey Franzoy (CEO, Charlie Chedda's)
    613 S. Inca Dr., Pueblo West, CO 81007
    info@charliecheddas.com

## SCHEDULE 2
Property

Any going forward in the name of the LLLP. Any contributed capital or property used for any start-up or expansion owned solely by any Member, will be kept separate by account within the LLLP.

## SCHEDULE 3
Members' Shares of LLLP ownership

| | |
|---|---|
| Unit-e Global, L.C. | 50% |
| Charlie Chedda's LLC | 50% |

## SCHEDULE 4
Primary Percentage division of profits and losses

| | |
|---|---|
| Unit-e Global, L.C. | 50% |
| Charlie Chedda's LLC | 50% |

## SCHEDULE 5
Drawings & dividends

Drawings and dividends will be distributed on the 1st of each month by the Designated Member(s).
If LLLP is operating at a loss, no drawing or dividend will be distributed.

"Disposable Retained Earnings" shall refer to the amount of Retained Earnings less the amount required to operate the LLLP for the 3 upcoming months, given current knowledge of future events and historical data.

90% of Disposable Retained Earnings shall be distributed as Profit per Schedule 3.

Signature: _(signature)_

Email:  unitetechno@gmail.com

SIGNED by Unit-e Global, L.C.
By Eric Yockey

Signature: _(signature)_
Trey Franzoy (Jun 8, 2018)

Email:  treyfranzoy@gmail.com

SIGNED by Charlie Chedda's, LLC
By Trey Franzoy

### LLLP OPERATING AGREEMENT as of 6/8/2018

Whereas Unit-e Global, L.C. and Charlie Chedda's, LLC (General Member's) have entered into a Limited Liability Limited Partnership, Gold Farm Ltd. ("LLLP"), founded in the State of Wyoming, in accordance with all State and Federal regulations governing such partnerships, hereby ratifies the following Operating Agreement for specific operating practices of the LLLP. It is understood by the General Members that this agreement and any of its provisions works in conjunction with the broader founding agreement and does not supersede any provision within the founding agreement. In accordance with Wyoming law, this agreement will terminate with the broader founding agreement on the date specified therein unless amended prior.

### LLLP MEMBERS, CONTRIBUTIONS, AND DISTRIBUTIONS

1.  Entity: Charlie Chedda's, LLC (General member)
    Primary office: 1839 S. Academy Blvd., Colorado Springs, CO 80916
    Primary telephone: 719-313-9811
    Registered agent: Trey Franzoy
    Agent's address: 613 S. Inca Dr., Pueblo West, CO 81007
    Agent's telephone: 719-569-4110
    Estimated initial contribution(s): $100,000 startup capital, $5,000 legal, $500 licensing fees.
    LLLP ownership share / percentage of interest: 50%

2.  Entity: Unit-e Global, L.C. (General member)
    Primary office: 3737 Old Georgetown Rd., Halethorpe, MD 21227
    Primary telephone: (858) 848-6483
    Registered agent: Eric Yockey (CEO, Unit-e Global, L.C.)
    Agent's address: 1408 Gardman Ave., Baltimore, MD 21209
    Agent's telephone: (443) 794-5295
    Estimated initial contribution(s): $32,000 development labor, $38,400 security consultant & specialized development, $2,000 software license fees, $3,000 server/hosting installation/setup, $3,000 hosting fees (total, 6 months), $100/month security audits & data backup
    LLLP ownership share / percentage of interest: 50%

### LLLP OPERATIONS AND LIMITATIONS

LLLP is founded as a precious metals dealer and storage of precious metals custodian. LLLP will maintain bullion storage in accordance with properly licensed affiliates for independently verifiable auditing purposes and compliance with all State and Federal laws and regulations. Any individual wishing to store their independently purchased products from other vendors, where the chain of ownership cannot be verified by the LLLP, will have their items held in segregation for a period of 30 days, and the individual's local police department will be notified of the items to be stored. LLLP will not purchase any bullion products directly from any individual unless the chain of ownership can be verified, and in accordance with any local licensing and regulatory requirements.

LLLP will provide sales of bullion products that have been purchased, either from another verified and licensed distributor, or only from individuals where the entire chain of ownership can be verified through properly licensed and registered affiliates.

In accordance with the Bank Secrecy Act, Anti Money Laundering regulations, and KYC best practices, all account owners who do business directly with LLLP, either as buyers or sellers, will be required to maintain current identification on file that verifies any customer shipping address, including but not limited to:

- Proof of Citizenship

- Social Security Identification

- Non-Expired Passport, Driver's License, or other Official Identification Card


TMF


EY

- Utility statements showing at least 6 months occupation by the recipient at the shipping address.

Specific policies relating to compliance with all State and Federal laws and regulations will be kept on file at registered agent's office locally in Cheyenne, WY and any controlling member's primary business address. Independent audit and AML compliance certification will be performed annually at a minimum to ensure compliance with all State and Federal laws and regulations.

LLLP will not engage in any activity other than buying, selling, storing of physical bullion products, and providing independent software for tracking ownership. All General Members, when representing or operating in an official capacity for the LLLP, are prohibited from engaging in any activities regulated by the CFTC, SEC, or any activities requiring a money transmitter license. LLLP, managing members, designated members, and any employees, when representing or operating in an official capacity for the LLLP, are strictly prohibited from acting as a third party or intermediary for any bullion buying and/or selling transactions to remain exempt from any licensing required by the CFTC, SEC or money transmitter licensing regulations and requirements. Any bank accounts specifically under the control of the LLLP will be fully segregated from customer and/or affiliate accounts, as well as controlling member accounts to ensure compliance with this section.

LLLP or any General Members at no time will convert, portray, or associate in any virtual or "ebullion" transaction on behalf of the LLLP. Any transaction performed by the LLLP, or any member acting on behalf of, exclusively for the business purpose of buying, selling and storing precious metals products will involve a physically verified and existing product consisting of only precious metals bullion.

LLLP is not permitted and cannot acquire any debt, credit card, loan, or be entered into any contract that may result in debt or financial obligations on behalf of the LLLP without the prior written and signed consent from all General Members.

LLLP will acquire and maintain all insurance and bond requirements required by law, and/or in sufficient enough amounts and coverages, to cover all encumbrances. LLLP will maintain monetary account balances and precious metals storage balances in sufficient enough amounts and denominations as required and demanded by ownership of the balances. At no time will the LLLP or any controlling member "float" any part of a transaction without having sufficient and physical monies and/or products on hand and within the full control of the LLLP.

LLLP GENERAL MEMBERS RESPONSIBILITIES AND LIMITATIONS

Whereas the General members have designated members to act on their behalf in accordance with the founding agreement and this operating agreement, the following responsibilities and limitations are placed upon the General Members and their respective designated members.

Unit-e Global L.C. primary responsibilities will be to create, maintain, update, backup, and manage the entire e-commerce platform including all physical metals custodian and storage software, LLLP website, affiliate interface software, purchasing and selling merchant interface software. This includes the management of any hardware associated with the platform. Included in the platform will be a secure database to store all customer records verifying identity and addresses. It is understood by the controlling members that the e-commerce platform creation and maintenance is Unit-e Global L.C.'s contribution and stake of Member's LLLP share. Any initial costs and ongoing operating costs associated with the ecommerce platform will be paid by the LLLP.

Unit-e Global L.C. will be personally liable for any negligence and/or criminality in relation to the ecommerce platform resulting in damages to LLLP's reputation, ability to remain operational, an/ or agreements with affiliates. It is understood by the controlling members that Unit-e Global L.C. will implement all reasonable measures to ensure the upmost security for all parties involved with the ecommerce platform. Actions unforeseen and/or outside of the control of the LLLP and Unit-e Global, L.C. will not be considered negligence in accordance with this section.

Charlie Chedda's LLC primary responsibilities will be to provide initial operating capital, provide test locations for the ecommerce platform, maintain bookkeeping and accounting records in accordance with industry standards, cause audits to be performed in accordance with the founding agreement, ensure compliance with all State and Federal laws, regulations, and licensing requirements,




cause the daily operations expenses, bills and any other payments to be paid on time, maintain the LLLP's bank accounts in accordance with all State and Federal Laws, ensure that all customer information is correct, verified, and all hard copies and backups are securely stored. It is understood by the General Members that the initial operating capital and all responsibilities listed in this section is Charlie Chedda's LLC contribution and stake of Member's LLLP share. After initial startup capital expenses are funded, any ongoing fees, costs, and/or payments will be paid by the LLLP.

Charlie Chedda's LLC will be personally liable for any negligence and/or criminality in relation to the responsibilities listed in the section above resulting in damages to the LLLP's reputation, ability to remain operational, and/or agreements with affiliates. It is understood by the General Members that Charlie Chedda's, LLC will implement all reasonable measures to ensure the upmost security for all parties involved with the LLLP. Actions unforeseen and/or outside of the control of the LLLP and Charlie Chedda's, LLC will not be considered negligence in accordance with this section.

FORCE MAJEURE – A Member will be free of liability to the LLLP where the Member is prevented from executing their obligations under this agreement in whole or in part due to force majeure, such as earthquakes, typhoons, flood, fire, and war, governmental intervention, or any other unforeseen or uncontrollable event where the Member has communicated the circumstances of the event to any and all other controlling members (when possible), and where the Member has taken any and all appropriate action to satisfy their duties and obligations to the LLLP and to mitigate the effects of the event.

INDEMNIFICATION – All Members will be indemnified and held harmless by the LLLP from and against any and all claims of any nature, arising out of a Member's participation in LLLP affairs. A Member will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Member, or the breach by the Member of any provisions of this agreement.

LIABILITY – A Member or any employee will not be liable to the LLLP or any other Member for any mistake or error in judgement or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this agreement or the LLLP. The Member or employee will be liable only for any acts or omissions involving intentional wrongdoing.

AMDENDMENT OF THIS AGREEMENT -- No amendment or modification of this agreement will be valid or effective unless in writing and signed by all Members.

MISCELLANEOUS – If any term, covenant, condition, or provision of this agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, and the remainder of the provision found in this agreement will in no way be affected, invalidated or impaired as a result. This agreement along with the founding agreement contains the entire agreement between the Members. This agreement along with the founding agreement, and all terms and conditions contained within, apply to and are binding upon each Member's successors, assigns, executors, administrators, beneficiaries, and representatives.

**Signature:** *[signature]*

**Email:**  unitetechno@gmail.com

UNIT-E GLOBAL, L.C. (GENERAL & CONTROLLING MEMBER)
BY ERIC YOCKEY

**Signature:** *[signature]*
Trey Franzoy (Jun 8, 2018)

**Email:**  treyfranzoy@gmail.com

CHARLIE CHEDDA'S, LLC (GENERAL & CONTROLLING MEMBER)
BY TREY FRANZOY



# Gold Farm LLLP Agreements

Adobe Sign Document History      06/08/2018

| | |
|---|---|
| Created: | 06/08/2018 |
| By: | Eric Yockey (unitetechno@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAArqDLHUoU_WiXJmbat5eT7ySJMSpnPa91 |

## "Gold Farm LLLP Agreements" History

Document created by Eric Yockey (unitetechno@gmail.com)
06/08/2018 - 3:43:49 PM EDT- IP address: 108.3.150.60

Document emailed to Eric Yockey (unitetechno@gmail.com) for signature
06/08/2018 - 3:46:29 PM EDT

Document emailed to Trey Franzoy (treyfranzoy@gmail.com) for signature
06/08/2018 - 3:46:29 PM EDT

Document viewed by Trey Franzoy (treyfranzoy@gmail.com)
06/08/2018 - 3:47:17 PM EDT- IP address: 66.102.6.110

Document e-signed by Eric Yockey (unitetechno@gmail.com)
Signature Date: 06/08/2018 - 3:47:19 PM EDT - Time Source: server- IP address: 108.3.150.60

Document e-signed by Trey Franzoy (treyfranzoy@gmail.com)
Signature Date: 06/08/2018 - 3:57:52 PM EDT - Time Source: server- IP address: 50.246.216.102

Signed document emailed to Trey Franzoy (treyfranzoy@gmail.com) and Eric Yockey (unitetechno@gmail.com)
06/08/2018 - 3:57:52 PM EDT

Adobe Sign

## Jan I. Berlage

| | |
|---|---|
| **From:** | Scott A. Homar <Scott@kukerlaw.com> |
| **Sent:** | Wednesday, May 1, 2024 11:17 AM |
| **To:** | Jan I. Berlage |
| **Cc:** | Judith AW. Studer; Abbey Block; Tracey Collins; Tobit Glenhaber; Holly Hills; George Calhoun |
| **Subject:** | RE: TIME SENSITIVE: Unit-E Global, L.C. v. Charlie Chedda's, LLC: Arbitration Demand |
| **Attachments:** | 2022.03.04 Cease and Desist.pdf |

Dear Ms. Berlage:

As I'm sure you know, Mr. Franzoy and Charlie Chedda's, LLC attempted to invoke the arbitration clause back in March of 2022. See attached letter. Your clients failed to acknowledge or respond to said demand. It has been over two years since arbitration was demanded by my client. Further, suit was filed in Maryland, counterclaims were made, and significant litigation has ensued on claims that were, or could have been, subject to the arbitration clause.

As such, your clients have expressly or implicitly waived their right to arbitration. Please see ***EmpRes at Riverton, LLC v. Osborne***, 538 P.3d 670, 674, 2023 WY 112, ¶ 13 (Wyo., 2023).

Scott A. Homar

 **OVERSTREET HOMAR & KUKER**
**ATTORNEYS AT LAW**

Scott A. Homar
508 E. 18th Street
Cheyenne, Wyoming 82001
307.274.4444 office
307.274.4443 facsimile
Scott@kukerlaw.com

The above communications constitute privileged and confidential attorney client communications and are inadmissible in any proceedings of any kind or nature. The above statements do not constitute tax advice and cannot be used in furtherance of any attempt to evade federal tax obligations. If you are the unintended recipient of this email, please contact Overstreet Homar & Kuker at 307.274.4444 or Scott@kukerlaw.com

**From:** Jan I. Berlage <JBerlage@ghsllp.com>
**Sent:** Wednesday, May 1, 2024 7:24 AM
**To:** Scott A. Homar <Scott@kukerlaw.com>
**Cc:** Judith AW. Studer <jstuder@schwartzbon.com>; Abbey Block <ablock@ifrahlaw.com>; Tracey Collins <TCollins@ghsllp.com>; Tobit Glenhaber <tglenhaber@ghsllp.com>; Holly Hills <hhills@schwartzbon.com>; George Calhoun <george@ifrahlaw.com>

**EXHIBIT 2**

**Subject:** TIME SENSITIVE: Unit-E Global, L.C. v. Charlie Cheddar's, LLC: Arbitration Demand
**Importance:** High

## *TIME SENSITIVE*

## ARBITRATION DEMAND

## *Unit-E Global, L.C. v. Charlie Cheddar's, LLC*

Scott:

If we do not hear from you by tomorrow, we intend to seek court intervention to enforce our right to arbitration in this matter.

I trust that will not be necessary and look forward to hearing from you.

Sincerely,
Jan

GOHN HANKEY & BERLAGE LLP

| *Baltimore* | *Annapolis* | *Jan I. Berlage* |
|---|---|---|
| *201 North Charles Street* | *111 Cathedral Street* | Direct: 410-752-1261 |
| *Suite 2101* | *Suite 301* | Mobile: 443-857-7789 |
| *Baltimore, Maryland 21201* | *Annapolis, Maryland 21401* | JBerlage@ghsllp.com |
| *410-752-9300* | | |
| *410-752-2519 fax* | | |
| *www.ghsllp.com* | | |

**From:** Jan I. Berlage
**Sent:** Monday, April 22, 2024 12:30 PM
**To:** scott@kukerlaw.com
**Cc:** Judith AW. Studer <jstuder@schwartzbon.com>; Abbey Block <ablock@ifrahlaw.com>; Tracey Collins <TCollins@ghsllp.com>; Tobit Glenhaber <tglenhaber@ghsllp.com>; Holly Hills <hhills@schwartzbon.com>; George Calhoun <george@ifrahlaw.com>
**Subject:** RE: Unit-E Global, L.C. v. Charlie Cheddar's, LLC: Arbitration Demand
**Importance:** High

## ARBITRATION DEMAND

## *Unit-E Global, L.C. v. Charlie Cheddar's, LLC*

Scott:

It is a pleasure to meet you via email. Please let me know which arbitrator your clients would like to use. Our recommendations are as follows:

- The Honorable Thomas W. Rumpke
  https://www.martindale.com/attorney/hon-thomas-w-rumpke-573789/

- The Honorable William Downes
  https://www.jamsadr.com/downes/

- The Honorable Wade Waldrip
  https://www.idr-adr.com/about_judge_waldrip

We look forward to hearing from you at your earliest convenience but, in any event, by this **Wednesday, April 24.**

Sincerely,
Jan

GOHN HANKEY & BERLAGE LLP

| *Baltimore* | *Annapolis* | *Jan I. Berlage* |
|---|---|---|
| *201 North Charles Street* | *111 Cathedral Street* | Direct: 410-752-1261 |
| *Suite 2101* | *Suite 301* | Mobile: 443-857-7789 |
| *Baltimore, Maryland 21201* | *Annapolis, Maryland 21401* | JBerlage@ghsllp.com |
| *410-752-9300* | | |
| *410-752-2519 fax* | | |
| *www.ghsllp.com* | | |

**From:** George Calhoun <george@ifrahlaw.com>
**Sent:** Monday, April 22, 2024 12:10 PM
**To:** Jan I. Berlage <JBerlage@ghsllp.com>
**Cc:** Judith AW. Studer <jstuder@schwartzbon.com>; Abbey Block <ablock@ifrahlaw.com>; Tracey Collins <TCollins@ghsllp.com>; Tobit Glenhaber <tglenhaber@ghsllp.com>; Holly Hills <hhills@schwartzbon.com>; scott@kukerlaw.com
**Subject:** Re: Unit-E Global, L.C. v. Charlie Cheddar's, LLC: Arbitration Demand

Jan,

I do not represent Charlie Chedda's in Wyoming (and am not admitted to practice there). Charlie Chedda's has retained Wyoming counsel, Scott Homar, who I have copied. I note that your clients previously refused to arbitrate in Wyoming and that there is substantial doubt that there is a valid arbitration provision. I will let you work that out with Mr. Homar.

For purposes of the Maryland action, I was disappointed to see the arbitration demand given your client's refusal to make any good faith settlement offer and the lack of merit of the claim. The approach seems costly and counter-productive to obtaining a resolution with which everyone can live. The funds wasted on this venture would be better spent seeking a negotiated resolution.

Sincerely,

3

 **Ifrah**Law



**George Calhoun**

☏ (202) 524-4147
✉ george@ifrahlaw.com
🌐 ifrahlaw.com

**Better Insights. Better Odds.**

Learn how we heighten the success of our iGaming
clients **through every phase** of the business cycle.  

---

**From:** Jan I. Berlage <JBerlage@ghsllp.com>
**Date:** Monday, April 22, 2024 at 10:48 AM
**To:** George Calhoun <george@ifrahlaw.com>
**Cc:** Judith AW. Studer <jstuder@schwartzbon.com>, Abbey Block <ablock@ifrahlaw.com>, Tracey Collins <TCollins@ghsllp.com>, Tobit Glenhaber <tglenhaber@ghsllp.com>, Holly Hills <hhills@schwartzbon.com>
**Subject:** RE: Unit-E Global, L.C. v. Charlie Cheddar's, LLC: Arbitration Demand

## ARBITRATION DEMAND

*Unit-E Global, L.C. v. Charlie Cheddar's, LLC*

George:

Per my voicemail, we need to select an arbitrator for the above-referenced matter. We are coming up on a month since we sent you our original demand.

Please get back to me as soon as possible but, in any event, by this **Wednesday, April 24.**

Thank you,
Jan

GOHN HANKEY & BERLAGE LLP

| *Baltimore* | *Annapolis* | *Jan I. Berlage* |
|---|---|---|
| *201 North Charles Street* | *111 Cathedral Street* | Direct: 410-752-1261 |
| *Suite 2101* | *Suite 301* | Mobile: 443-857-7789 |
| *Baltimore, Maryland 21201* | *Annapolis, Maryland 21401* | JBerlage@ghsllp.com |

4

*410-752-9300*
*410-752-2519 fax*
*www.ghsllp.com*

**From:** Jan I. Berlage
**Sent:** Thursday, March 28, 2024 4:58 PM
**To:** George Calhoun <george@ifrahlaw.com>; info@charliecheddas.com
**Cc:** Judith AW. Studer <jstuder@schwartzbon.com>; Abbey Block <ablock@ifrahlaw.com>; Tracey Collins <TCollins@ghsllp.com>; Tobit Glenhaber <tglenhaber@ghsllp.com>; Holly Hills <hhills@schwartzbon.com>
**Subject:** Unit-E Global, L.C. v. Charlie Cheddar's, LLC: Arbitration Demand
**Importance:** High

## ARBITRATION DEMAND

### *Unit-E Global, L.C. v. Charlie Cheddar's, LLC*

Trey and George:

Per sections 27 and 28 of the Gold Farm Limited Liability Partnership LLP ("Gold Farm") Agreement (the "Agreement"), attached is Unit-e Global, L.C.'s arbitration demand on Charlie Cheddar's LLC concerning Gold Farm. A hard copy is in the mail to each of you.

We look forward to hearing from you at your earliest convenience but, in any event, by April 12.

Sincerely,
Jan

GOHN HANKEY & BERLAGE LLP

| *Baltimore* | *Annapolis* | *Jan I. Berlage* |
|---|---|---|
| *201 North Charles Street* | *111 Cathedral Street* | Direct: 410-752-1261 |
| *Suite 2101* | *Suite 301* | Mobile: 443-857-7789 |
| *Baltimore, Maryland 21201* | *Annapolis, Maryland 21401* | JBerlage@ghsllp.com |
| *410-752-9300* | | |
| *410-752-2519 fax* | | |
| *www.ghsllp.com* | | |